**UNITED STATES of America, Plaintiff,**

v.

**Myles Joseph CONNOR, Jr., Defendant.**

**Nos. 89–30097, 89–30101.**

United States District Court,
C.D. Illinois.

March 31, 1992.

Byron G. Cudmore, First Asst. U.S. Atty., Springfield, Ill., for plaintiff.

Gregory Collins, Springfield, Ill., for defendant.

## ORDER

McDADE, District Judge.

This case is back before the Court on remand for resentencing. On July 16, 1990, Judge Richard Mills sentenced the defendant to 240 months imprisonment having decided an upward departure was warranted. The trial court initially determined an adjusted offense level of 24 (26 minus 2 for acceptance of responsibility) and a criminal history category of V, yielding a guideline sentencing range of 92–115 months of imprisonment. The upward departure reflected the Court's finding that there were aggravating circumstances of a kind and to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. Additionally, the Court found that the defendant's criminal history category did not adequately reflect the seriousness of his past criminal conduct or the likelihood that he will commit other crimes. Accordingly, the Court found that an increase in the offense level to 32 and an increase in the criminal history category to VI were appropriate. This gave a guideline range of 210–262 months; and the defendant was sentenced to 240 months. *United States v. Connor*, 743 F.Supp. 582 (C.D.Ill.1990).

On appeal, the Appellate Court rejected the District Court's reasons for supporting the upward departure as being inappropriate grounds for departure and remanded the case for resentencing consistent with

its opinion. 950 F.2d 1267. Having given due consideration to the teachings of our Appellate Court in its opinion, this Court found upon resentencing that an upward departure was still called for in this case and sentenced the defendant to a term of 155 months imprisonment. This opinion articulates the specific reasons for the upward departure as required by Section 3553(c) of Title 18 United States Code.

## I. STATEMENT OF FACTS [1]

On December 6, 1988, the defendant met with an undercover FBI agent at the Ramada Inn in Bloomington, Illinois. The two struck a deal whereby the defendant agreed to sell the undercover agent a stolen Simon Willard grandfather clock. The purchase price was $10,000. The clock was stolen from the estate of the Woolworth family in Winthrop, Maine, in 1973. Its current market value is between $15,000–20,000. The defendant also indicated that he was in the possession of at least 12 Japanese works of art that he would be willing to sell to the undercover agent. The defendant further stated that he would contact some of his associates and get them working on obtaining other stolen items that may be of interest to the agent.

On January 12, 1989, the undercover agent again met with the defendant in Bloomington. The defendant offered the agent three paintings that he said had been stolen from the Meade Gallery at Amherst College, Amherst, Massachusetts. The defendant's asking price was $60,000, and he stated that the paintings had a value in excess of $125,000.

Also during this meeting, the defendant and the undercover agent negotiated for the defendant to supply cocaine to the agent for distribution in the Bloomington area. The defendant was to supply two kilos of medium quality cocaine every week for distribution to the students at the University of Illinois and one kilo of high grade cocaine every 3 weeks for distribution to the agent's preferred customers. The defendant stated that he would have no problem supplying these amounts once he raised enough capital for the first shipment. The agent also purchased 100 hits of lysergic acid diethylamide (LSD) which had a total weight of .562 grams and 93 tylox pills which contained 29.57 grams of acetaminophen. The purchase price for these drugs was $1,700.

On January 11, 1989, the defendant transported two stolen paintings from the State of Kentucky and gave the paintings to the undercover agent as collateral for a $10,000 loan to the defendant. The paintings, "St. John the Baptist" by Pieter Lastman and "Interior of the Nieuwe Kerk, Delft" by Henrick Cornelisz, were stolen in 1975 from the Meade Art Gallery at Amherst College. "St. John the Baptist" has a current market value of $160,000 and "Interior of the Nieuwe Kerk, Delft" has a 'current market value of $250,000.

On March 1, 1989, the undercover agent and a confidential source met with the defendant at the Logan International Airport in East Boston, Massachusetts. The undercover agent gave the defendant $24,000 with the understanding that the money was to be used to purchase cocaine. The defendant stated that he and the confidential source would fly to Ft. Lauderdale, Florida, purchase a kilo of cocaine, and deliver it to the agent in Bloomington, Illinois, the following week.

The defendant and the confidential source proceeded to Ft. Lauderdale, purchased the cocaine, and returned to Illinois. The defendant was arrested upon his return. Government agents seized 950.62 grams of 96% pure cocaine and 5.51 grams of 92% pure cocaine from the defendant.

After the defendant was arrested and charged, the magistrate ordered that he be detained pending trial. The defendant was held in the Menard County Jail in Petersburg, Illinois.

On June 11, 1989, the United States Marshal's Service received information from a confidential source indicating that the defendant and another prisoner, Lester Prier, had acquired some hacksaw blades and were planning a jail break. Federal agents met with Prier and, after having been ad-

**1.** As recited by Judge Mills in his sentencing opinion filed July 20, 1990.

vised of his constitutional rights, Prier stated that Margo Konces sent Connor four hacksaw blades concealed in a book. (Although Konces was involved in the escape attempt, it was later determined that it was not she who sent Connor the saw blades.)

The agents searched the cells of Connor, Prier, and another prisoner, Michael Wright. The search turned up four hacksaw blades and a hardbound book containing a hollowed out area in which the blades could be concealed. The agents also observed that a four to five inch cut had been made in the steel ceiling of Prier's cell and that the head of a bolt on an exhaust duct had been sawed off.

In an effort to apprehend Connor's outside accomplices in the escape attempt, the agents decided to make it appear as if the escape had been successful. Thus, at the direction of federal agents, the confidential informant telephoned Margo Konces in Massachusetts and identified himself as an inmate who had escaped with Connor. Konces inquired as to how she could be of help. Upon being informed that the supposedly escaped prisoners needed someone to transport them, Konces informed the confidential informant that she would recruit Suzanne King, the defendant's girlfriend. Plans were made to have King meet the prisoners at the Menard County Fairgrounds.

On June 13, 1989, an undercover United States Marshal posing as an escaped prisoner met Suzanne King at the Menard County Fairgrounds. King informed the marshal that she brought a .38 caliber handgun, hair dye, razors, and clothes for the escaped prisoners and was taking them to Kentucky. The marshal then placed King under arrest and Margo Konces was arrested the next day.

Margo Konces eventually pleaded guilty to conspiring to aid and abet the defendant in his attempted escape. Suzanne King pleaded guilty to conspiring to conceal an escaped prisoner.

On November 22, 1989, Myles Connor also entered a plea of guilty to the charges against him. Specifically, he pleaded guilty to two counts of transportation of stolen property, two counts of distribution of a controlled substance, one count of possession with intent to distribute, one count of conspiracy to distribute, and one count of attempted escape. The defendant also pleaded guilty to a one count information (received as a transfer under Fed. R.Crim. P. 20 from the District of Massachusetts) charging him with possession with intent to distribute a controlled substance.

The United States Probation Office prepared a detailed Presentence Report, and this case came on for initial sentencing on July 16, 1990.

## II. RESENTENCE CONSIDERATIONS

The United States Probation Office submitted modifications to its Presentence Report consistent with the mandate of the Appellate Court in its Opinion of December 10, 1991. The Probation Office identified defendant's Adjusted Offense Level as 26 (28 minus 2 for acceptance of responsibility) and a criminal history category of IV, resulting in a guideline imprisonment range of 92–115 months. It was, however, found by this Court that this case involved aggravating circumstances of a kind, and to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from the guideline range. Title 18 U.S.C. § 3553(b). This finding does not flow from any one factor but the gestalt resulting from the confluence of defendant's aggravated offense conduct (the purity of the cocaine), his serious criminal history as reflected, his penchant to engage in criminal activity when he is not incarcerated, and the similarity between the underlying conduct in the instant offense and the predicate conduct underlying an earlier conviction in 1971. In applying this confluent stream of factors, a combination not reflected in the guidelines, the Court found that an upward departure from the guideline range was warranted. Having found that grounds for departure do, in fact, exist and that these factors were not adequately considered by the Sentencing Commission, the Court

sought to guide the degree of departure by looking at the guideline range specified for a defendant with an offense level of 28 and a criminal history category of VI. Thus, the Court found that the imprisonment range reflected by a category VI and an offense level of 28 is a more representative sentencing profile. Since a defendant with a criminal history category of VI and an offense level of 28 would have a guideline range of 140–175 months, the Court sentenced the defendant to 155 months imprisonment.

Due to the unusually high purity of the cocaine involved in the defendant's drug trafficking scheme, it is reasonable to believe that the defendant occupied a relatively high position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that this offense involved 96 and 92 percent pure cocaine indicates that the defendant had a prominent role in the drug trafficking enterprise. U.S.S.G. § 2D1.1, Comment (n. 9).[2] This factor establishes a more serious offense conduct and one for which the Sentencing Commission did not provide other than through departure. However, the Court is not considering departure on this basis alone but in conjunction with the other factors previously mentioned and discussed below. To guide this departure, the Court believed the defendant's position in the drug distribution enterprise based on the purity of the cocaine, can be cross-referenced to the role in the offense adjustment. Even if this factor was inappropriate to consider in justifying departure, the Court would still impose the same sentence for the reasons which follow.

The determination that this case warrants an upward departure, and one of this magnitude, is also based on the following factors.

(1) First, the defendant's April 20, 1971, conviction for assault and battery arose out of an attempted theft of antiques in 1966. This predicate criminal objective is sufficiently similar to the instant offenses involving an attempt to obtain and sell antiques and/or works of art as to strongly indicate the likelihood that the defendant will commit further crimes.[3] This similar objective when considered in conjunction with the fact that the defendant spent over half of the past 15 years[4] in prison, are reliable indicators that the defendant is a recidivist. Further indications of his tendencies to relapse into crime include that twice during this 15-year period he was released on parole only to be reincarcerated in less than 24 months. He was first paroled in October 1972. On July 18, 1974, he committed a number of new offenses which subsequently resulted in his parole being revoked. He was reparoled on December 15, 1977, to a State of Massachusetts sentence and was released to the community on January 27, 1978. This reparole was revoked on October 10, 1979, as a result of his association with known

---

2. Defendant argues that high purity should only be relevant where small quantities of cocaine are involved and that this case does not involve a small quantity. Defendant suggests that when left to his own devices, defendant only had access to small quantities of cocaine with less purity citing defendant's arrest in connection with the Massachusetts charge of possession with intent to distribute which involved only 3.4 grams of 82% pure cocaine. The Court notes that 82% is still a relatively high purity when one considers that normal street level purity is 30%–50%.

3. As observed by the Appellate Court, while the two offenses are not similar, there is a similarity in the underlying criminal objective.

4. As determined by the Appellate Court, at page 1274 of its Opinion; n. 4, "(i)t appears that Connor was in prison from May 1969 to March 1980 except for parole from October 2, 1972 to April 25, 1975, and from January 27, 1978 to October 10, 1979. He was again in prison from about October 30, 1985 to June 26, 1986. Connor was also in prison for a conviction that has been vacated from approximately 1980 to 1985. Our analysis is not affected by the fact the sentence was vacated; Connor's opportunity to commit crime was curtailed even though he was wrongly imprisoned."

felons. As observed by the Appellate Court, he "has in the past displayed a tendency to return to a life of crime soon after he is released" (Appellate Court Opinion, pp. 1274).

2) The criminal history of the defendant is still a very serious one [5] despite the fact that his past criminal history does not qualify him for career offender status under U.S.S.G. § 4B1.1 and some serious felony convictions cannot be counted in determining his criminal history category because of age or being related under U.S.S.G. §§ 4A1.2(a) and 4A1.2(e); and,

(3) Defendant's past criminal conduct is significantly more serious than that of most defendants in criminal history category IV [6] (7 to 9 criminal history points). Based on the following analysis, it is believed that the defendant's criminal history is actually more like that of a defendant in criminal history category VI (13 or more criminal history points).[7]

When one looks at the pattern of counted and uncounted convictions of the defendant since 1966, a total of 12, and the seriousness of those offenses, it is obvious that the defendant is a menace to society; and having adopted criminal conduct as his motivating force in life, it is likely that he will commit other crimes in the future.

On February 27, 1967, the defendant pleaded guilty to assault with intent to murder and was sentenced to 12–20 years in prison. The defendant, armed with a revolver, assaulted an individual with intent to murder him.

The same day the defendant pleaded guilty to assault and battery by means of a dangerous weapon and was sentenced to 7–10 years in prison to run concurrent with his other sentence. Also on February 27, 1967, the defendant pleaded guilty to two counts of assault and battery by means of a dangerous weapon and three counts of assault by means of a dangerous weapon, one count of unlawfully carrying a firearm, and one count of unlawfully carrying a dagger. In that case, the defendant committed assault and assault and battery on five individuals while armed with a revolver and a dagger. He was sentenced to 3–5 years in prison to run concurrent to his previous other sentences.

All three of these offenses were appropriately considered related cases as the underlying criminal conduct occurred on the same date, and they were consolidated for sentencing. Had these three cases not been related, they each would have been assigned 3 criminal history points for a total of 9 points. In addition, a second set of related offenses, i.e., sale or receipt of stolen goods (District of Maine); possession of a dangerous weapon (switchblade knife); and possession of a dangerous weapon (.38 caliber pistol) were committed on July 18, 1974, but were adjudicated in separate courts, one in the District of Maine on December 2, 1975; and the other two in State Superior Court on April 20, 1976. Had these cases been counted separately, they would also have resulted in 9 criminal history points instead of the 3 points assigned.

On April 20, 1971, the defendant was convicted of assault and battery and was sentenced to 1–2 years to run concurrent to

---

**5.** The Appellate Court found Connor's prior crimes to be serious although "not extraordinary or atypical." (Page 1273 of opinion.)

**6.** The Court appreciates the holding of the Appellate Court that past criminal conduct excluded from the determination of defendant's criminal history category or career offender status because of age or being "related cases" cannot *per se* justify an upward departure because they are not of a kind or degree not contemplated by the Sentencing Commission. However, there is no inconsistency between that holding and a finding that the total picture of counted and uncounted convictions indicate or present more

extensive criminal conduct than otherwise reflected by defendant's criminal history or by the typical defendant with a criminal history category IV. *U.S. v. Williams*, 910 F.2d 1574, 1579. (7th Cir.1990); vacated on other grounds, —— U.S. ——, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992).

**7.** Even if this factor were not considered as appropriate in determining departure, the Court would still impose the same sentence based upon all the other reasons discussed in this Order.

his other sentences. The defendant was arrested for breaking, entering, and larceny in the night time for stealing antiques from a private home. He assaulted the deputy sheriff who arrested him. Seven days later he assaulted another deputy sheriff during an escape attempt. This conviction, which was not assigned any criminal history points because of its age, would have receive 3 points. In 1975, the defendant was convicted of possession of a dangerous weapon and was sentenced to 1–2 years.

Had all the above individual offenses been assigned points, the defendant would have received an additional 15 criminal history points. Since he received 9 points initially (category IV), he only needed 4 more points to put him in category VI (13 or more points). With this as a guide, it is determined that the defendant's violent/serious criminal history most closely resembles that of most defendants with a category VI criminal history.

This culmination of serious criminal history conduct in conjunction with the defendant's penchant to engage in criminal activity when he is not in jail and the similarity of the underlying conduct in the instant offense with the predicate criminal objective in the 1971 conviction and the high quality of the cocaine in the instant offense would warrant an upward departure. This overall picture is one of a person who is likely to commit further crimes.

In determining the extent of departure, the Court considered defendant's cooperation or offer to cooperate with the government. Although the substance of most of his offers to cooperate were not helpful nor of interest to the government, the effort to cooperate was made, and there is no evidence that it was not made in good faith. Although defendant's cooperation was deemed too insignificant to warrant a downward departure, the Government apparently considered it adequate to forbear from requesting an upward departure, but reserving the right to recommend a sentence at the top of the guideline range determined by the Court. The government has persisted in this approach to defen-

dant's cooperation, and in deference to the government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the defendant's assistance appears limited, the Court concludes that it is more appropriate to consider defendant's cooperation in determining the sentence within the representative guideline range rather than in the determination of the extent of departure.